## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | : CHAPTER 11 |
| | : |
| **400 WALNUT ASSOCIATES, L.P.** | : BANKRUPTCY NO. 10-16094(SR) |
| | : |
| **Debtor** | : |
| | : |

---

## AMENDED DISCLOSURE STATEMENT WITH RESPECT TO PLAN OF REORGANIZATION PROPOSED BY 400 WALNUT ASSOCIATES, L.P. A PENNSYLVANIA LIMITED PARTNERSHIP DEBTOR-IN-POSSESSION

---

*[THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT]*

**ARIS J. KARALIS, ESQUIRE**
**MASCHMEYER KARALIS P.C.**
**1900 Spruce Street**
**Philadelphia, PA 19103**
**(215) 546-4500**
**Attorneys for the Debtor**

Dated: ~~December 7, 2010~~April 7, 2011

This DISCLOSURE STATEMENT is being distributed to all creditors and partners of 400 WALNUT ASSOCIATES, L.P. (the "Debtor" or the "Reorganized Debtor"), pursuant to 11 U.S.C. §1125. It relates to the Plan of Reorganization (the "Plan") proposed by the Debtor dated ~~October 21, 2010~~April 7, 2011, a copy of which is enclosed herewith. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Plan.

## DEBTOR'S PRELIMINARY STATEMENT AND SOLICITATION

As a creditor or partner involved in the 400 Walnut Associates, L.P. bankruptcy, you should take the time to vote on the proposed Plan, which, if confirmed, will affect your economic interest. Before casting your ballot, it is important that you be properly informed about the nature of the Chapter 11 Case and the workings of the proposed Plan and its consequences. This Disclosure Statement has been approved by the Bankruptcy Court as containing adequate information to enable you to make an informed decision about the Plan. The Debtor urges you to review the Disclosure Statement and Plan, consult with your own legal counsel or other advisers if you think it is appropriate and, for the reasons which follow, vote in favor of the Plan.

If you are a creditor, the Debtor believes that you should be paid in full. Unfortunately, bankruptcy results, as it did in this case, when it becomes difficult or impossible for a business to pay its debts in full when due. Here, payment of the debts of the Debtor in full is possible over time. The Debtor believes that its major asset, a 67-unit luxury apartment building with a commercial unit known as the Greentree Apartments has a reasonable prospect of generating revenues sufficient to meet the obligations of the Reorganized Debtor under the Plan. The Debtor has devoted considerable time and energy to negotiating a Plan which it believes will provide its creditors with a significantly greater and more certain return than any other likely outcome of the bankruptcy, and particularly more than a liquidation.

The Reorganized Debtor will own the Property (hereinafter defined) of the Debtor after the Effective Date. The Debtor believes that the refinance of the 4th Walnut Claim coupled with the increased revenues from operations will yield an operating entity able to handle its debt service requirements, operating expenses and Plan payments going forward.

Both the Debtor's Plan of Reorganization and the bankruptcy case are somewhat complex. You should read this Disclosure Statement and the Plan before you decide how to vote.

## PART A - GENERAL

## 1.    OVERVIEW AND SUMMARY

### 1.1    Identity of Debtor

400 Walnut Associates, L.P. is a Pennsylvania limited partnership formed in 1999, which owns the Green Tree Apartment Building, a 67 unit luxury apartment building with one commercial unit (the "Apartment Building") located on an approximate .23 acre site (the "Site") at 400-414 Walnut Street, Philadelphia (the "Site" and, together with improvements thereon, the "Property"). The Property is the Debtor's principal asset. 400 Walnut Corporation, whose sole shareholder is John J. Turchi, Jr. is the General Partner and owns a 1% interest in the Debtor.

1

There are two limited partners of the Debtor, John J. Turchi, Jr. who owns an 89% interest and 400 Walnut Greentree Associates, L.P. which owns a 10% interest. The Debtor is controlled by John J. Turchi, Jr. and parties related to him, the Debtor's business address is 1700 Walnut Street, Philadelphia, Pennsylvania 19103. The Debtor is in the business of owning and operating the Apartment Building.

### 1.2    History of the Debtor and the Property

The Debtor purchased the Apartment Building on May 12, 2000 for the sum of $3,645,000. The initial acquisition of the Apartment Building was financed with equity and proceeds of a loan from Bancorp. The Property is located in a historic district that is listed in the National Register of Historic Places maintained by the Department of the Interior pursuant to the National Historic Preservation Act of 1966 and the National Park Service has certified that the Property is of historic significance to that district. Renovations to rehabilitate and improve the Apartment Building were completed on or about June 2003 and the Apartment Building began operating shortly thereafter. The construction costs totaled approximately $17,415,143 which included the developer's fee of $2,450,000. The renovations were financed (including the refinance of the Bancorp loan) with equity and the proceeds of a construction loan made on or about May 30, 2001 in the principal amount of $12,000,000 from Amalgamated Bank of New York and the sale of historic rehabilitation tax credits ("Tax Credits"), described in Section 47 of the Internal Revenue Code of 1986, as amended. The Tax Credits are explained in more detail in Section 1.4 of this Disclosure Statement.

On February 20, 2004, the Amalgamated Bank construction loan with a balance of approximately $12,041,505 was refinanced by new credit facility extended by Independence Community Bank in the amount of $13,125,000. The new loan was evidenced by a MultiFamily Note in the principal amount of $13,125,000 dated February 20, 2004 and to secure its obligations to make payments under the MultiFamily Note, the Debtor entered into a Multifamily Mortgage, Assignment of Rents and Security Agreement dated as of February 20, 2004 and Lender's Subordination, Nondisturbance and Attornment Agreement dated February 20, 2004 in connection with the Master Lease Agreement (as hereinafter defined). Sometime in 2006, Sovereign Bank acquired Independence Community Bank and became the successor in interest to the MultiFamily Note and the related loan documents.

The economic slowdown and recession that affected the nation and the Philadelphia Region in 2008 and, thereafter, caused declining occupancy at the Apartment Building and, ultimately, brought about the circumstances which led to the Debtor's deteriorated financial position.

The Debtor was able to make payments under the MuliFamily Note until June 2009. On or about November 2009, Sovereign Bank declared a default under the loan documents and on or about January 29, 2010, Sovereign Bank filed a Complaint in Mortgage Foreclosure styled *Sovereign Bank vs. 400 Walnut Associates,* Philadelphia County Court of Common Pleas, Case No. 100103364. On January 29, 2010, the Debtor reached an oral forbearance agreement with Sovereign Bank that resolved the default declared and the foreclosure complaint it filed. At the conclusion of the meeting on January 29, 2010 between Sovereign Bank and the Debtor, Sovereign was to reduce to writing the oral forbearance agreement.

Under the forbearance agreement, the Debtor was to continue to collect the rents, pay the expenses associated with the property and remit to Sovereign Bank the net rents after payment of the expenses. Further, interest was to be charged at the contract rate not the default rate and the term of the forbearance was to continue until the maturity date of the loan, March 1, 2011. The mortgage foreclosure complaint was to be withdrawn.

Since January 29, 2010, the Debtor was operating in reliance on the forbearance agreement reached at the meeting with Sovereign Bank.

**1.3**     **Sale of the Sovereign Bank Loan Documents**.

The June 2010, monthly loan statement issued by Sovereign to the Debtor reflects the following:

**Loan Information**

| | |
|---|---|
| Current Principal Balance | $11,984,927.52 |
| Coupon Interest Rate | 5.00% |
| Interest Paid YTD | $47,696.45 |
| Days in Billing Cycle | 30 |
| Taxes Disbursed YTD | $64,881.37 |

**Payment Information**

| | |
|---|---|
| Past Due Principal | $ 272,114.24 |
| Past Due Interest | $ 596,146.95 |
| Past Due Escrow | $ 70,300.36 |
| Past Due Late Charge | $ 72,217.85 |
| Default Interest | $1,381,818.02 |
| Past Due Fee | $ 75.00 |
| Total | $2,392,672.42 |
| | |
| Current Principal | $ 21,654.89 |
| Current Interest | $ 48,803.39 |
| Current Escrow | $ 5,407.72 |
| Late Charge from last month | $ 3,793.30 |
| Total | $ 79,659.30 |
| | |
| Total Payment | $2,472,331.72 |
| Payment Due Date | 07/01/2010 |

The Debtor does not dispute that the principal balance under the Sovereign Loan as of the Petition Date was $11,984,927.52. However, since the Debtor intends to cure the pre-petition defaults under the Sovereign Loan by a lump sum payment on the Effective Date, it asserts that all consequences of the pre-petition default will be void, including the applicability of the default interest rate, late charges, and any prepayment premium. (See Section 1.8.3 for a discussion of the Principal Balance, Default Interest, Late Charges and Prepayment Premium in connection with the 4th Walnut Note).

By letter dated June 30, 2010, Robert Craig at Sovereign Bank informed the Debtor that Sovereign Bank had sold the loan to 4th Walnut Associates, L.P., a Delaware limited partnership ("4[th] Walnut"). 4th Walnut purchased the Sovereign Bank Loan Documents at a discount, paying only $9,550,000 for a loan that had a principal balance due of approximately $11,985,000. By buying the loan at a discount, 4th Walnut has effectively been able to alter the yield on the loan and their return. Upon information and belief, 4th Walnut is now trying to use the secured claim they purchased as a vehicle to obtain title to the Property and as a result has taken actions to interfere with the Debtor's efforts to reorganize its affairs.

By letters dated July 2, 2010 ("July 2[nd] Letters"), counsel for 4th Walnut, informed the Debtor and Greentree (as hereinafter defined) that (a) the Sovereign Bank loan is in default, (b) all payment obligations under the terms of the loan documents with Sovereign Bank have been accelerated, and (c) borrower's license to collect rents from the Property has been revoked and terminated. The July 2nd Letters are in direct conflict with the agreement reached between the Debtor and Sovereign Bank. The Debtor advised 4th Walnut of the forbearance agreement with Sovereign Bank and that the statements in the July 2nd Letters were not accurate.

On July 23, 2010, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. Since filing for bankruptcy relief, the Debtor has continued to operate its business as a debtor-in-possession.

### 1.4    The Master Lease Agreement and the Tax Credits

On May 29, 2002, 400 Walnut Greentree Associates, L.P. ("Greentree") entered into the following agreements:

a.    Partnership Agreement (the "Partnership Agreement") between 400 Walnut Corporation, as the general partner and holder of a one tenth percent (.1%) interest holder and Chevron TCI, Inc. ("Chevron") as a limited partner and a ninety-nine and nine tenths percent (99.9%) interest holder;

b.    A lease agreement dated May 29, 2002, as amended, between the Debtor, as landlord, and Greentree, as tenant, for the Property (the "Master Lease Agreement");

c.    HTC Pass-Through Agreement whereby historic rehabilitation tax credits were passed from the Debtor to Greentree in connection with the rehabilitation of the Property;

d.    Investor Note (the "Investor Note") whereby Chevron promised to loan the sum of $1,893,716 to Greentree;

e.    Investor Security Agreement between Greentree as the secured party and Chevron as the debtor securing the payments under the Investor Note;

f.    Supplemental Management Agreement between Greentree and 400 Walnut Corporation whereby 400 Walnut Corporation agreed to provide consultation services to Greentree in connection to the Property. The 400 Walnut Corporation retained the Property Manager to manage the Property;

g.   Turchi Guaranty Agreement whereby John J. Turchi, Jr. agreed to guaranty to Chevron certain obligations under the Partnership Agreement;

h.   Chevron Guaranty Agreement whereby Chevron U.S.A., Inc. agreed to Guaranty to Greentree certain obligations under the Partnership Agreement and the Investor Note; and

i.   Purchase Agreement (the "Purchase Agreement") between 400 Walnut Corporation and Chevron in connection to certain "put" and "call" options relating to a future sale of Chevron's interests in Greentree.

Greentree, in total, received $1,893,716 from the sale of the Tax Credits to Chevron, which were characterized as capital contributions to Greentree.

Prior to the Petition Date, Greentree subleased the apartments at the Property to third party tenants. Pursuant to the Master Lease Agreement, Greentree would collect the rents from the third party tenants at the Property, pay the operating costs related to the Property and remit the remaining funds to the Debtor. The net funds remaining each month were not sufficient to satisfy the monthly rental obligation due the Debtor under the Master Lease. Greentree utilized the services of the Turchi, Inc. to manage and operate the building.

As of the Petition Date, Greentree was in default under the Master Lease Agreement because it had failed to pay rent as it came due to the Debtor. As of June 30, 2010, Greentree owed the Debtor past due rent in the amount of $4,601,224. In the event of default under the Master Lease, the Debtor has the right to, _inter alia_, terminate the Master Lease.

As of the Petition Date, the Master Lease Agreement had no value to the estate and it no longer required the Master Lease Agreement. Accordingly, on the Petition Date, the Debtor filed a Motion to reject the Master Lease Agreement (the "Rejection Motion") as of the Petition Date and requested that the Rejection Motion be heard on an expedited basis. By Order dated August 24, 2010, the Master Lease Agreement was rejected as provided by the provisions set forth therein and is no longer applicable.

The Debtor has continued to honor all occupancy agreements and lease agreements with third party tenants at the Property so long as each third party tenant continues to pay their obligations under their respective occupancy/lease agreements to the Debtor.

### 1.5    Condition of Debtor as of Petition Date

On or about the Petition Date, the Debtor had the following assets:

| | |
|---|---|
| Real Property | $ ~~(to be determined by appraisal)~~13,150,000 |
| Cash and Deposits | 21,580 |
| Accounts Receivable | 3,946,901 |
| Tangible Personal Property | 3,000 |
| Estimated Total Assets | $3,949,901 plus value of Real Property~~17,121,481~~ |

5

~~The real property referred to above consists of the Property. The Debtor has retained a valuation expert to appraise the Property. Prior to the Petition Date, Sovereign Bank had engaged ARD Appraisal Company, a valuation expert who valued the Property as follows:~~

> ~~"As Is" as of September 9, 2009 at $11,800,000;~~
> ~~"As Stabilized" as of June 1, 2010 at $11,900,000; and~~
> ~~"Liquidation" as of September 9, 2009 at $7,980,000~~

(See Section 1.6 for a discussion of a fair market appraisal of the Property.)  The deposits referred to above consisted of approximately $21,580 on deposit with various third parties.  The tangible personal property referred to above consists of miscellaneous office equipment, furnishings, fixtures and supplies.

On or about the Petition Date, the Debtor had the following estimated liabilities:

| | |
|---|---|
| 4th Walnut Secured Claim (as assignee) | $11,984,000 |
| RAIT Secured Claim | 691,250 |
| Priority Claim | 110 |
| Unsecured Claims | 581,611 |
| Affiliated Unsecured Claim | 4,273,066 |
| Estimated Total Liabilities | $17,530,037 |

The Debtor has not completed its analysis of the claims and it may be objecting to some claims, in whole or in part.  The unsecured claims listed above include numerous trade creditors and insider creditors of the Debtor.  The RAIT secured claim listed above is secured by a second mortgage lien on the Property.

## 1.6   **Valuation of Property**

When valuing the real property, several methods are used and often different numbers are arrived at which reflect the valuation method used.  In a bankruptcy case, the Bankruptcy Court will often look at different methodologies in order to analyze a party's various rights under the Bankruptcy Code.

For example, for purposes of determining the feasibility of a plan, the Court will often look to the "going concern" or fair market value of the property.  At the same time, though, the Court might look to the liquidation value (which is typically less than the going concern value) when determining a party's rights in a liquidation context.

The Debtor engaged Ludwig Corporation, a valuation expert who valued the Property in its "As Is" condition, as of October 26, 2010 at $13,100,000.  4th Walnut engaged Reaves C. Lukens Company, a valuation expert who valued the Property in its "As Is" condition, as of November 2, 2010 at $13,200,000.

~~Sovereign Bank engaged ARD Appraisal Company, a valuation expert who valued the Property as follows:~~

> ~~"As Is" as of September 9, 2009 at $11,800,000;~~

"As Stabilized" as of June 1, 2010 at $11,900,000; and
"Liquidation" as of September 9, 2009 at $7,980,000

~~The Debtor is in the process of obtaining its own appraisal, but believes that the value of
the Property exceeds the debt due 4th Walnut. 4th Walnut is also in the process of obtaining an
updated appraisal and has asserted that the value of the Property is less than the debt due 4th
Walnut.~~

In a liquidation context, such as in a fire sale or foreclosure, the Debtor believes the
Property ~~would~~ will sell for the appraised value. ~~sell for less than the debt due 4th Walnut.~~
Accordingly, the Debtor assumed in connection with the liquidation analysis attached as Exhibit
"A" to this disclosure statement that the liquidation value of the Property would be ~~less than the
debt due 4th Walnut~~approximately $13,150,000. However, the demand for residential apartment
buildings in center city has been brisk and if competitive bidding should occur, the property may
sell for an amount equal or greater than the appraised value. A liquidation analysis is provided
to inform creditors of the estimated return they would receive in a Chapter 7 proceeding.

## 1.7    **Basic Concept of Proposed Plan**

The implementation of the Plan will address the following components, which are
discussed below: (i) Plan funding, (ii) management of the Property, (iii) the cure of the Debtor's
default under the 4th Walnut Note, (iv) the extension of the monthly installments of principal and
interest under the 4th Walnut Note for an additional five (5) years, and (v) the refinance of the
Property to pay the Allowed Secured Claim of 4th Walnut on or before March 1, 2016.

Subject to the Plan being confirmed, the Debtor ~~and Turchi~~ will place into a reserve
account to be established by the Disbursing Agent cash sufficient to make payments required on
the Effective Date to the Classes as set forth in the Plan.

The Bancorp Bank is processing a loan commitment for the Debtor to be utilized to fund
the Plan that provides for a line of credit in the amount of $2,000,000 or, in the alternative, a
$12,000,000 Commercial Mortgage in the event that 4th Walnut elects the Alternative Effective
Date Cash Option provided under Section 3.1.6 of the Plan. Bancorp has advised that the terms
of these credit facilities that are being considered are as follows:

**Line of Credit**

A. Borrower:                400 Walnut Associates, L.P. (or Nominee)

B. Purpose:                This Line will provide exit financing to fund the payments required
                under the Amended Plan of Reorganization dated December 7,
                2010, as amended (the "Plan") proposed by the Borrower;
                provided, however, if the existing first lien holder, 4th Walnut
                Associates, LP, elects the Alternative Effective Date Cash Option
                (as detailed in Section 3.1.6 of the Plan) then, Bank will consider
                the financing detailed in the Alternative Financing Section of this
                proposal.

C. Amount:                         $2,000,000

D. Rate:                           Wall Street Journal Prime Rate floating plus 2.00% floating daily

E. Loan Fee:                       1/2% ($10,000)

F. Maturity:                       Twelve (12) months

G. Repayment:                      Twelve (12) months interest only

H. Prepayment Penalty:             N/A

I. Collateral:                     A third mortgage lien on the real property located along Walnut and
                                   South 4th Street in the City of Philadelphia comprised of land and a
                                   67 unit apartment building with one commercial unit a/k/a 400
                                   Walnut Street, Philadelphia, Pennsylvania.
                                   a.  All of John Turchi's interests in the Borrower and the
                                       general partner of the Borrower shall be pledged, delivered
                                       and assigned to the Bank.
                                   b.  All claims held by an affiliate of the Borrower that are
                                       Class 5 Claims under the Plan including any payments
                                       distributed under the Plan on account of such Class 5
                                       Claims shall be assigned to the Bank.

J. Guarantors:                     John J. Turchi, Jr. and Mary Elizabeth Turchi and additional
                                   corporate guarantors to be determined by the Bank.

K. Lease Requirements:             Borrower shall provide to Bank copies of signed and executed
                                   lease agreements with Subject Tenants. Collectively, the leases
                                   must provide gross annual rental revenue of at least $1,200,000.
                                   The final rent roll lease must be acceptable to the Bank.

L. Permits:                        Borrower shall provide Bank with evidence in the form of
                                   building permits, use permits, zoning permits, environmental
                                   permits and other instruments satisfactory to Bank establishing
                                   that all buildings and improvements located or to be constructed
                                   on the Real Estate Collateral are in compliance with all laws,
                                   ordinances and regulations, and that there is no action or
                                   proceeding pending or threatened before any court or
                                   administrative agency regarding the validity of such laws,
                                   ordinances or regulations and any certificates or permits issued
                                   thereunder.

M. Zoning:                         Borrower shall provide Bank with written evidence satisfactory to
                                   Bank that the Real Estate Collateral have been zoned for purposes
                                   consistent with Borrower's use thereof, and that there are no
                                   pending proceedings, whether administrative, legislative or
                                   judicial, which would in any manner adversely affect that status
                                   of the zoning of the Real Estate Collateral, or any part thereof.

| N. Conditions: | Confirmation of a plan of reorganization in the bankruptcy case of the Borrower, acceptable to Bank, in its sole discretion and the expiration of all applicable periods of appeal, or that any appeal taken be adjudicated in favor of the Borrower. |

## Alternative Financing

## Commercial Mortgage

| A. Borrower: | 400 Walnut Associates, L.P. (or Nominee) |
| --- | --- |
| B. Purpose: | This mortgage loan will provide exit financing to fund the $11,000,000 cash option to 4th Walnut Associates, LP (as provided under the Alternative Effective Date Cash Option, detailed in Section 3.1.6 of the Plan) and the other payments required under the Amended Plan of Reorganization dated December 7, 2010, as amended (the "Plan") proposed by the Borrower. |
| C. Amount: | $12,000,000 |
| D. Rate: | Fixed 5.25% |
| E. Loan Fee: | 1/2% ($60,000) |
| F. Maturity: | Twenty-Four (24) months |
| G. Repayment: | Equal principal and interest payments based on 25 year amortization |
| H. Prepayment Penalty: | N/A |
| I. Collateral: | 1. Title insured first mortgage on the real property located along Walnut and South 4th Street in the City of Philadelphia comprised of land and a 67 unit apartment building with one commercial unit a/k/a 400 Walnut Street, Philadelphia, Pennsylvania (the "Real Estate Collateral"); |
| | 2. A perfected first securtity interest in all of Borrower's assets, including all of the Borrower's present and future accounts, contracts, chattel paper documents, general intangibles, copyrights, patent rights, equipment, investment properties and inventory and all products and proceeds thereof and all returned, reclaimed and/or repossessed goods; |
| | 3. Assignment of Rents and Leases. |
| J. Guarantors: | John J. Turchi, Jr. and Mary Elizabeth Turchi and additional corporate guarantors to be determined by the Bank. |

K. Conditions:          Confirmation of a plan of reorganization in the bankruptcy case of the Borrower, acceptable to Bank, in its sole discretion and the expiration of all applicable periods of appeal, or that any appeal taken be adjudicated in favor of the Borrower.

## Terms and Conditions for the Loans

A. Financial Reporting:      The Borrower and each Guarantor shall provide the Bank with annual financial reports, copies of rent rolls (within forty-five days of year-end) for the Real Estate Collateral and personal and corporate tax returns (within ten days of such filings), as well as any other financial information and reports that may be requested by the Bank. This information will be presented to the Bank on a timely basis and in a form satisfactory to the Bank.

B. Depository Services:      The preferential interest rate is predicated upon the Borrower establishing and maintaining the Bank as its primary depository. Borrower's failure to establish such a depository account will allow the Bank, in its sole discretion, to increase the Loan Rate herein described by .50% per annum.

C. Costs:              Borrower will be responsible for the out-of-pocket costs incurred by the Bank relating to the funding of Loan, including, but not limited to, recording costs, appraisal fees, environmental reports, title insurance, construction inspection fees, property surveys, flood insurance (if applicable) and the Bank's legal documentation fees.

D. Documentation:        Bank reserves the right to approve all documentation used in connection with the Loan and reserves the right to impose such additional covenants, conditions, default, confession of judgment, waiver of jury trial provisions and other terms, and to require other such documentation as a prudent bank would require.

E. Additional
   Requirements:         Borrower will be responsible for providing Bank with all information normally required in underwriting a loan of this type. These requirements are outlined in the attached Exhibit A.

F. Environmental:         Phase I Environmental Report addressed to the Bank by an entity approved by Bank indicating an absence of hazardous waste, contaminators, negative soil conditions or wet lands, which may indicate the Real Estate Collateral to be in conflict with any federal, state or local statutes.

G.  Insurance:                    At closing, Borrower must provide the Bank appropriate evidence of property, liability (and/or builder's risk) coverage for the Real Estate Collateral, with the Bank named as mortgagee and loss payee.

H.  Participation:                Final approval of this loan by the Bank may be subject to the Bank's ability to secure a suitable participant for up to 50% of the loan at rates and conditions favorable to the Bank. The Bank, in its sole discretion, may determine whether a participant is suitable and whether the terms of the participation are favorable to the Bank.

The Debtor expects to have a formal commitment for the financing from The Bancorp on or before the Confirmation Hearing.  Turchi and his wife have agreed to provide the guaranties requested by The Bancorp which is one of the conditions that must be satisfied in order to obtain the above stated exit financing.  To the extent the Debtor is not able to obtain this financing by the Confirmation Hearing, the feasibility of the Plan will be negatively impacted.

The above stated line of credit in the amount of $2,000,000 provides the Debtor not only with the funds required to make the necessary payments on the Effective Date which are estimated to total $1,785,973 but also working capital of $214,027 to the Reorganized Debtor after the Effective Date.  The above stated commercial mortgage in the amount of $12,000,000 provides the Debtor with the necessary funds to pay 4th Walnut in a lump sum the amount of $11,000,000 in the event they elect the Alternative Effective Date Cash Option provided under Section 3.1.6 of the Plan.

        On the Effective Date, the Debtor shall modify and assume the existing Management Agreement between the Debtor and Turchi, Inc. dated May 1, 2001 (the "Management Agreement").  From and after the Effective Date, management fees shall be paid a management fee equal to 4% of gross revenue, reimbursement of wages for employees dedicated to the Property, and a leasing commission fee of $250 per each 12-month lease payable to the applicable employee/agent.  Management fees that are accrued and unpaid as of the Effective Date ("Accrued Fees") shall be paid by the Reorganized Debtor as funds become available to make such payments; provided, however, no Accrued Fees shall be paid until payment of all allowed claims of Class 1, Class 2, Class 3 and Class 4 claimants in accordance with the Plan.

The Plan provides that the Debtor's default under the 4th Walnut Note will be cured.  The Plan provides that principal balance due under the 4th Walnut Note as of June 30, 2010 is $11,984,927.52 and the The Plan provides that accrued and unpaid interest (at the contract rate of 5%) due under the 4th Walnut Note (up through the interest payment due just prior to the Effective Date) and past due amortization installments due under the 4th Walnut Note (up through the principal payment due just prior to the Effective Date), less the amount of the adequate protection payments paid to 4th Walnut and monthly installments of the tax escrow payment of $5,916.67 from January 1, 2011 through the Effective Date will be paid on the Effective Date.  From the Effective Date forward, the monthly principal and interest installments of $70,458.28 will be paid to 4th Walnut through February 1, 2016 as will the monthly tax escrow payments in the amount of $5,407.72$5,916.67.  Interest will be paid at the contract rate of 5% annual interest.  On or before March 1, 2016, any remaining principal balance due under the 4th Walnut Note plus accrued interest (at the annual contract rate of 5%) will be paid.  By

11

reinstating the terms of the 4th Walnut Note, the Debtor is inherently providing 4th Walnut with payments equal to the value of their Allowed Claim because they will be receiving precisely what they are entitled to under the 4th Walnut Note, in the manner, at the time and at the interest rate that they bargained for when the 4th Walnut Note was delivered. The only change the Debtor is making to the 4th Walnut Note is the extension of the term for an additional five (5) years. These payments are discussed below and in "PART B - THE PLAN AND ITS CONSEQUENCES." To the extent the Bankruptcy Court determines that the principal balance due under the 4th Walnut Note as of June 30, 2010 is greater than $11,984,927.52 or that interest to be paid to 4th Walnut should be at a rate greater than the contract rate of 5% the Plan will be negatively impacted.

4th Walnut shall retain its liens against the property of the Reorganized Debtor and the secured status of its Claim as against the property of the Reorganized Debtor to the same extent as exists on the Effective Date. The 4th Walnut obligation will maintain its secured status to the extent of any pre-petition security interests. The lien of 4th Walnut shall be extinguished upon payment in full of its Allowed Claim, as provided in the Plan.

In lieu of the above treatment, the Debtor is affording 4th Walnut the opportunity to elect an alternative treatment, the "Alternative Effective Date Cash Option" which provides for payment of the amount of $11,000,000, such payment to be made on the Effective Date; provided, however, that 4th Walnut must (i) affirmatively elect the Alternative Effective Date Cash Option treatment under Section 3.1.6 of the Plan on the ballot cast in connection with the Plan, (ii) vote to accept the Plan, (iii) not file any objection to confirmation of the Plan and (iv) support confirmation of the Plan. A failure of 4th Walnut to make such affirmative election shall result in treatment of the 4th Walnut's Allowed Claim as provided for in Sections 3.1.1 through 3.1.5 of the Plan. Any payment made under Section 3.1.6 of the Plan to 4th Walnut shall effect a full and final satisfaction of 4th Walnut's Claim such that neither the Debtor, nor the Reorganized Debtor, nor the general partner, nor any guarantor, nor any other person shall have any liability on account of 4th Walnut's Claim.

Prior to the Petition Date, RAIT Partnership, on June 15, 2004, entered into a loan transaction with Turchi and Turchi, Inc. whereby RAIT loaned $600,000 (the "RAIT Loan"). The RAIT Loan was secured by a collateral assignment of 100% of Turchi's ownership interest in Turchi, Inc., collateral assignment of the Incentive Management Fee under the Supplemental Management Agreement in connection with the Property, and collateral assignment of the development fee under the development agreement between the Debtor and Turchi Inc. for the Property. Prior to the Petition Date and as an inducement to RAIT to enter into discussions to restructure the RAIT Loan, which was and is in default, the Debtor executed that certain guaranty and suretyship agreement in favor of RAIT (the "Guaranty"). Under the Guaranty, the Debtor absolutely, unconditionally, and irrevocably (a) guaranteed and agreed to act as surety with respect to the obligations due under the RAIT Loan. In order to collateralize the Debtor's obligations under the Guaranty, the Debtor on July 9, 2010, granted RAIT a mortgage on the Property which was recorded on or about July 9, 2010. The Debtor proposes to pay the Allowed Claim of RAIT (Class 2), as more particularly described in "PART B - THE PLAN AND ITS CONSEQUENCES." The lien of this creditor shall be extinguished upon payment in full of its Allowed Claim, as provided in the Plan.

4th Walnut has asserted that since the RAIT mortgage was recorded within ninety days of the Petition Date it is voidable as a preference pursuant to 11 U.S.C. §547 or, as a fraudulent transfer pursuant to 11 U.S.C. §548. For this reason, 4th Walnut asserts that the RAIT Claim should be reclassified as an unsecured claim. However, RAIT holds a mortgage against the Property which justifies them being separately classified. At the time the mortgage was granted to RAIT, the Debtor believed it was solvent and was exploring options to refinance both the Sovereign Bank loan and claim due RAIT. Since all creditors are being paid in full under the Plan there is no basis for the Debtor to incur fees and costs to attempt to avoid the RAIT subordinate mortgage at this juncture. Further, the treatment provided to RAIT under Class 2 is not as favorable as the treatment afforded to Unsecured Creditors under Class 4. For example, holders of Allowed Class 4 Unsecured Claims will be paid in full in four equal payments of 25% the first, payable within 30 days of the Effective Date, and the remaining three payments, on the first, second and third years after the Effective Date. In contrast, RAIT as the holder of an Allowed Class 2 Claim will only receive monthly interest payments commencing on the first month after the Effective Date and its principal balance shall be due on March 1, 2016; provided, however, no principal balance shall be paid to RAIT until the 4th Walnut Class 1 Claim has been paid in full. 4th Walnut has reserved its right to contest the classification of the RAIT Claim at the time of the confirmation hearing and the Debtor and RAIT reserve all rights to contest any such objection.

Unless they elect on their ballot to receive a cash payment in lieu thereof, the general unsecured creditors will receive four payments equal in the aggregate to 100% of their allowed amount of their unsecured claims, without interest, the first payment in the amount of 25% of their Allowed Claim payable within thirty days of the Effective Date, the second payment, in the amount of 25% of their Allowed Claim payable on the first anniversary of the Effective Date, the third payment, in the amount of 25% of their Allowed Claim payable on the second anniversary of the Effective Date and the final payment in the amount of 25% of their Allowed Claim payable on the third anniversary of the Effective Date. See the discussion of Class 4 in "[PART B - THE PLAN AND ITS CONSEQUENCES" for a fuller description of the treatment of the Allowed Claims of the general unsecured creditors.

The Alternative Effective Date Cash Option afforded to holders of Allowed Class 4 Claims is as follows: any Class 4 Claimant shall have the right to elect payment of an amount equal to seventy (70%) percent of the Allowed Claim, such payment to be made on the Effective Date; provided, however, that the Class 4 Claimant must (i) affirmatively elect such treatment in the ballot relating to voting to approve or reject the Plan, (ii) vote to accept the Plan, and (iii) not file any objection to confirmation of the Plan. A failure of any Class 4 Claimant to make such affirmative election shall result in treatment of the Class 4 Claimant's Allowed Claim as provided for in Section 3.4.1 of the Plan. Any payment made under Section 3.4.2 of the Plan shall effect a full and final satisfaction of such claim such that neither the Debtor, nor the Reorganized Debtor, nor the general partner, nor any guarantor, nor any other person shall have any liability on account of such Claim.

Unsecured creditors affiliated with the Debtor (Class 5) will receive a cash flow note, without interest that shall provide for no payments until all Class 1, Class 2, Class 3 and Class 4 payments are paid as set forth in the Plan, described more fully in "PART B - THE PLAN AND ITS CONSEQUENCES".

The current equity holders will retain their interests in the Debtor.

13

~~On or before~~By the Effective Date, ~~Turchi~~ the Debtor shall advance to the Disbursing Agent the monies required to make the payments due on the Effective Date on account of Allowed Class 1 Claims, Class 2 Claims, Class 3 Claims, and Class 4 Claims. ~~Turchi~~ Debtor will also advance to the Disbursing Agent on or before the Effective Date the monies required to pay all Fee Claims. Turchi reserves the right to make advances to the Debtor and/or the Reorganized Debtor, as determined in his sole and absolute discretion. ~~The a~~Advances made by Turchi ~~shall~~ represent "new value contributions". If 4th Walnut elects the Alternative Effective Date Cash Option under Section 3.1.6 of the Plan, the Reorganized Debtor ~~and Turchi~~ may refinance the Property and use the proceeds from the refinance ~~(Turchi will advance any shortfall)~~ to make the payments required on the Effective Date of the Plan.

No distributions of any nature shall be paid to holders of Class 6 Interests or Class 7 Interests until Turchi has been repaid all monies that he, his agents or affiliates advance under this Plan. ~~The~~ Any advances being made by Turchi, his agents or affiliates under the Plan shall have a priority over any and all distributions that the Debtor may otherwise make to holders of Class 6 Interests and/or Class 7 Interests until Turchi, his agents or affiliates have been paid in full.

Maschmeyer Karalis P.C. shall act as Disbursing Agent solely for the funds to be advanced by ~~Turchi and~~ the Debtor and required to be disbursed on the Effective Date under the Plan to holders of Allowed Class 1 Claims, Class 2 Claims, Class 3 Claims, Class 4 Claims, and all Fee Claims incurred through the Effective Date. The Debtor will pay directly all Fee Claims, all Administrative Claims and all installments that come due after the Effective Date. The Disbursing Agent shall be empowered to: (1) take all steps and execute all instruments and documents necessary to make distributions to holders of Allowed Claims under the Plan; (2) calculate all distributions to Creditors and issue checks from the funds advanced by ~~Turchi and/or~~ the Debtor to make the distributions contemplated by the Plan; (3) if needed, employ or retain professionals to represent it with respect to its responsibilities; (4) file a final report with the Court after all distributions have been made under the Plan; and (5) pay the fees and expenses of the Disbursing Agent and the Debtor's professionals. The duties and responsibilities of the Disbursing Agent shall automatically terminate after the Disbursing Agent files its final report of Distributions with the Court. The Disbursing Agent shall have no personal liability for serving in the fiduciary capacity of Disbursing Agent, except for willful misconduct or gross negligence. The Disbursing Agent may continue to serve as counsel for the Debtor and the Reorganized Debtor concurrent with it acting as the Disbursing Agent.

## 1.8   Special Considerations

As noted above, this Disclosure Statement has been prepared in conjunction with a Plan of Reorganization developed to address the financial problems and provide for payment of the Debtor's obligations following the conclusion of the reorganization proceedings. There are a number of factors which may affect the realization of the Plan's objectives and which you should consider prior to voting on the Plan. Since the Plan addresses certain claims that will be paid out over a period of time in excess of only five years (e.g. the balloon payment to 4th Walnut is due on March 1, 2016 and the last payment to Class 4 is due on the third anniversary date of the Effective Date), the probability that any of the factors discussed below may materialize tends to be less as compared to plans to be carried out over a longer time frame.

### 1.8.1   Ability to Refinance the Property

14

If 4th Walnut elects the Alternative Effective Date Cash Option under Section 3.1.6 of the Plan, the Reorganized Debtor and Turchi will refinance the Property and use the proceeds from the refinance (Turchi will advance any shortfall) in order to make the payments required on the Effective Date of the Plan.    If 4th Walnut does not elect the Alternative Effective Date Cash Option under Section 3.1.6 of the Plan, the Debtor will continue to operate the Property for an additional five year period and will refinance the Property on or before March 1, 2016 and utilize the proceeds to pay on or before March 1, 2016, the any remaining principal balance due 4th Walnut plus accrued interest (at the annual contract rate of 5.0%). An estimated Sources and Uses of Funds as of the Effective Date is attached as Exhibit "B".

### 1.8.2    Ability to Generate Net Operating Income

The Plan contemplates that the Reorganized Debtor will generate net operating income in each of the years following the Effective Date through the fifth anniversary of the Effective Date, which will be sufficient to enable the Debtor to (a) pay the monthly installments due 4th Walnut or if applicable, the replacement lender, (b) pay the projected installments to unsecured creditors not electing the cash option, (c) pay projected installments to Class 2 as described in Sections 3.2 of the Plan, (d) pay operating expenses and (e) pay any remaining principal balance due 4th Walnut plus accrued interest (at the annual contract rate of 5.0%) on or before March 1, 2016.  Turchi will advance to the Debtor any funds required to satisfy any shortfall on account of the monthly installments due 4th Walnut.  The new line of credit that is being obtained by the Debtor will provide working capital of $214,027 after payment of the payments due creditors on the Effective Date.

### 1.8.3    Principal Balance, Default Interest, Late Charges and Prepayment Premium

Exhibit C – Financial projections of the Debtor provides for repayment of delinquent interest to 4th Walnut at 5% (the contract rate) and it also provides for a principal balance of $11,984,928 as of the Petition Date. 4th Walnut contends that the appropriate interest should be 16%, which is the asserted default rate and that the inclusion of default rate interest from June 2009 through the Effective Date would increase the amounts due to 4th Walnut by an additional sum in excess of $1.5 million. Further, 4th Walnut also contends that it is due late charges and a prepayment premium which it estimates in excess of $700,000.

Also, 4th Walnut is taking the position that it can go back in time (approximately 15 months prior to when it purchased the 4th Walnut Note) and assert that a default occurred before the date on which Sovereign declared a default, recalculating what it believes to be the default rate of interest each month, adding these inflated unpaid interest installments each month to the principal balance and then charging interest upon interest on a prospective basis until the date that Sovereign Bank declared a default. To add insult to injury, 4th Walnut is also taking the position that payments paid by the Debtor to Sovereign, which were applied by Sovereign in a specific fashion, can now be reconfigured and reapplied by 4th Walnut in a totally different manner. The end result of the actions taken by 4th Walnut is that the claim held by 4th Walnut has been inflated millions of dollars. For example, Sovereign Bank reflected the principal

balance as of June 30, 2010 as $11,984,985 whereas in comparison, 4th Walnut has asserted in its proof of claim that it filed with the Court a principal balance of $13,200,754 an increase in excess of $1,215,769. The Debtor asserts that 4th Walnut has improperly inflated the principal balance due under the 4th Walnut Note and is not entitled to assert a principal balance under the 4th Walnut Note that is greater than the principal balance reflected by Sovereign on its books and records and to the Debtor. Section 3.3.5 herein provides additional information regarding the proof of claim filed by 4th Walnut.

The Debtor asserts that upon cure of the default under the 4th Walnut Note, all consequences of the default will be void, including the applicability of the default interest rate, late charges and any prepayment premium. For this reason, the Debtor disputes that 4th Walnut is entitled (i) to interest at the default rate, (ii) to collect late charges or (iii) to collect any prepayment premium. To the extent that it is entitled to default interest, late charges and/or any prepayment premium, the feasibility of the Plan will be negatively impacted.

## 1.9    Inherent Unreliability of Projections

The Debtor believes the Plan is feasible based upon the projections of the ongoing operations of the Property following the Effective Date of the Plan, which are attached hereto as Exhibit "C". The assumptions on which these projections are based are also included in Exhibit "C." The Debtor believes that the assumptions are conservative and has made every effort to confirm their validity. But, inasmuch as they involve predictions as to future events, there can be no assurance that such assumptions and, hence, the projections, will, in fact, be borne out by subsequent events.

## 1.10    Inadequacy of Projected Net Operating Income

Due to any number of factors, it is possible that the Reorganized Debtor will be unable to generate the projected net operating income. The failure to do so may result in a default under the Plan or a default under the 4th Walnut Note and 4th Walnut Mortgage and exercise by 4th Walnut of the remedies available to it.

## 1.11    Identity of Partners of the Reorganized Debtor

The Reorganized Debtor will retain its current existence and membership subsequent to the Effective Date. It is anticipated that 400 Walnut Corporation, whose sole shareholder is John J. Turchi, Jr., will remain the general partner with a 1% interest in the Reorganized Debtor. The limited partners will include John J. Turchi, Jr. (89%) and Greentree (10%). John J. Turchi, Jr. and related parties will retain control of the Reorganized Debtor.

## 1.12    Management and Policies of the Reorganized Debtor

The Reorganized Debtor will continue to retain Turchi, Inc. as the property manager. Turchi, Inc. is an affiliated entity in that it is 100% owned by John J. Turchi, Jr., who is the principal officer of Turchi, Inc.

The property management agreement will be modified to provide for payment of a management fee equal to 4% of gross revenue, reimbursement of wages for employees dedicated to the Property, and a leasing commission fee of $250 per each 12-month lease payable to the

applicable employee/agent. From and after the Effective Date the Reorganized Debtor will pay the management fee due to Turchi, Inc. Accrued Fees shall be paid by the Reorganized Debtor as funds become available to make such payments; provided, however, no Accrued Fees shall be paid until payment of all allowed claims of Class 1, Class 2, Class 3 and Class 4 claimants in accordance with the Plan.

### 1.13   Uncertainty of Capital Needs

The renovations to the Property were completed in 2003 and the Property has been properly maintained. Accordingly, the Debtor believes that the Property is good physical condition and does not anticipate the need for significant capital expenditures in the next five (5) years.

### 1.14   Possibility of Large Unknown Unsecured Claims

The Bankruptcy Court set October 15, 2010 as the bar date for filing of proofs of claim in the case. Although the Debtor believes that it is aware of all major claims against it and has taken those claims into account in designing the proposed Plan, it is possible that large, unknown, unsecured claims will materialize at a later date. In that event, the ability of the Debtor to pay unsecured creditors under the Plan could be impaired.

## 2.2.   INFORMATION ABOUT THE REORGANIZATION PROCESS

### 2.1   Purpose of Disclosure Statement

The purpose of a disclosure statement is to provide the creditors and equity holders with sufficient information about the Debtor and the proposed plan of reorganization to permit them to make an informed judgment in voting on the plan. This Disclosure Statement, therefore, includes background information about the Debtor and also identifies the classes into which creditors have been placed by the Plan. The Disclosure Statement describes the proposed treatment of those classes and the possible effects of that treatment on the way in which the creditors' claims will be resolved if the Plan is confirmed. In addition, the Disclosure Statement contains information concerning the future prospects of the Debtor's business after the Effective Date, in the event the Plan is confirmed or, in the alternative, if confirmation is denied of the proposed Plan does not become effective.

This Disclosure Statement and the exhibits described herein have been approved by Order of the Bankruptcy Court dated _____, 20102011, as containing, in accordance with the provisions of the United States Bankruptcy Code, 11 U.S.C. §§101 et seq. (the "Bankruptcy Code"), adequate information of a kind and in sufficient detail that would enable a reasonable, hypothetical investor, typical of holders of impaired claims or interests, to make an informed judgment about the Plan. Bankruptcy Court approval of this Disclosure Statement, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

**YOU ARE URGED TO STUDY THE PLAN IN FULL AND TO CONSULT WITH YOUR COUNSEL AND OTHER ADVISORS ABOUT THE PLAN AND ITS IMPACT, INCLUDING POSSIBLE TAX CONSEQUENCES, UPON YOUR LEGAL RIGHTS. PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY BEFORE VOTING ON THE PLAN.**

A copy of the Plan is enclosed with this Disclosure Statement

## 2.2    Brief Explanation of Chapter 11

Chapter 11 is the principal business reorganization section of the Bankruptcy Code. Pursuant to Chapter 11, a debtor is permitted to reorganize its business for its own benefit and that of its creditors and other interest holders. Unless a trustee is appointed, the Debtor is authorized to continue too operate its business, and all attempts to collect pre-petition claims from the Debtor or to foreclose on property of the Debtor by any creditor are stayed during the pendency of the case unless the Bankruptcy Court orders otherwise.

The objective of a Chapter 11 case is the formulation of a plan of reorganization for the Debtor and its affairs. The plan is the vehicle for resolving claims against the Debtor, as well as providing for its future direction and operations.

Creditors are given an opportunity to vote on any proposed plan, and the plan must be confirmed by the Bankruptcy Court to be valid and binding on all parties. Once the plan is confirmed, all claims against the Debtor which arise before the Chapter 11 proceeding was initiated, are extinguished, unless specifically preserved in the Plan.

## 2.3    Voting Procedures

The Creditors entitled to vote on the present Plan are claimants who hold allowed claims or allowed interests in the "impaired" classes. A claim or interest is "allowed," (i) if it is listed on the Debtor's schedules as not disputed, contingent or unliquidated, (ii) if it is set forth in a timely filed Proof of Claim and not objected to by the Debtor as filed, or (iii) if it is approved by the Bankruptcy Court. Impaired claims are described in §1124 of the Bankruptcy Code and include claims that will not be repaid in full or as to which the legal rights are altered or interests are affected. A claim is not impaired if the holder of the claim receives, on the effective date of a plan, cash equal to the allowed amount of the claim or, in the case of an interest, the interest holder receives, on the effective date, cash equal to the greater of any fixed liquidation preference to which the holder is entitled or any fixed price under which any applicable security may be redeemed by the Debtor.

A holder of a claim or interest which is impaired by a plan is entitled to vote to accept or reject that plan if such claim or interest has been allowed or is deemed to have been allowed under §502 of the Bankruptcy Code, or is temporarily allowed for voting purposes under Rule 3018 of the Bankruptcy Rules. Voting is conducted by written ballot.

The Bankruptcy court has directed that, in order to vote either for acceptance or rejection of the Plan, claimants must file ballots in writing so that they are received no later than **5:00 P.M. on** _____, **2011,** at the following address

Maschmeyer Karalis P.C.
1900 Spruce Street
Philadelphia, PA 19103
Attn: Aris J. Karalis, Esquire
Telefax No. (215) 985-4175

**BALLOTS RECEIVED AFTER SUCH TIME WILL NOT BE COUNTED UNLESS THE COURT SO ORDERS. THE DEBTOR RECOMMENDS A VOTE "FOR ACCEPTANCE" OF THE PLAN.**

### 2.4    Ballots

Accompanying this Disclosure Statement is a ballot for acceptance or rejection of the Plan. Each party in interest entitled to vote on the Plan will receive a ballot. Please complete and sign your ballot and return in the envelope provided or by fascsimile. You must provide all of the information requested by the ballot. Failure to do so may result in the disqualification of your vote on such ballot.

Each member of a voting class will be asked to vote for acceptance or rejection of the Plan. All parties eligible to vote on the Plan are urged to complete and return their ballots promptly to avoid delay in confirmation of the Plan.

**ONLY THOSE CREDITORS WHO HAVE ALLOWED CLAIMS AND ARE ENTITLED TO VOTE ON THE PLAN UNDER THE BANKRUPTCY CODE WILL RECEIVE BALLOTS WHICH WILL ACCOMPANY THE APPROVED DISCLOSURE STATEMENT.**

If you have any questions regarding procedures for voting, contact the Debtor's attorney:

Aris J. Karalis, Esquire
Maschmeyer Karalis P.C.
1900 Spruce Street
Philadelphia, PA 19103
215-546-4500

### 2.5    The Confirmation Hearing

The Bankruptcy Court has scheduled a hearing on the confirmation of the Plan to commence on _____, **2011, at ____ a.m.,** or as soon thereafter as the parties can be heard. The confirmation hearing will be held in Courtroom No. 4, 2nd Floor, United States Bankruptcy Court, 900 Market Street, Philadelphia, Pennsylvania. At that hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and in the best interest of holders of claims and interests. The Bankruptcy Court will also receive and consider a ballot report prepared on behalf of the Debtor concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote.

### 2.6    Acceptance or Rejection

In order for the Plan to be accepted and, thereafter, confirmed, it must be accepted by at least one class of claims or interests which is impaired by the Plan. In order for a class of claims to vote to accept the Plan, votes representing at least 2/3 in amount and more than ½ in number

of claims voted in that class must be cast for acceptance of the Plan. In order for a class of interest to vote to accept the Plan, votes representing at least 2/3 in amount of those interests voted in that class must be cast for the acceptance of the Plan.

Section 1129(b) of the Bankruptcy Code provides that, as long as one class of claims or interests impaired by the Plan accepts the Plan, confirmation may be sought despite the rejection of the Plan by one or more other impaired classes. If a class impaired by the Plan rejects the Plan, no claim or interest that is junior to the most senior rejecting class may retain or receive property pursuant to the Plan solely on account of such claim or interest unless the senior rejecting class is paid in full. The Plan cannot be confirmed over the objections of a rejecting class unless the Bankruptcy Court finds that the Plan does not unfairly discriminate against, and is fair and equitable to, that class. Pursuant to §1129(b) of the Bankruptcy Code, the Debtor intends, if necessary, to request that the Bankruptcy Court confirm the Plan even in the event a class of creditors or interest holders does not vote in the requisite majority to accept the Plan.

### 2.7   <u>Disclaimers</u>

THIS DISCLOSURE STATEMENT, WHEN APPROVED BY THE BANKRUPTCY COURT, IS THE ONLY APPROVED STATEMENT CONCERNING THE MATTERS AND FACTS DEALING WITH THE SOLICITAITON OF ACCEPTANCES FOR THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED IN IT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OR RIGHTS MADE IN CONNECTION WITH THIS DISCLOSURE STATEMENT SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN A CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT WAS COMPILED.

THE STATEMENTS AND REPRESENTATIONS CONTAINED HEREIN ARE MADE SOLELY BY OR AT THE INSTANCE OF THE DEBTOR AND THE DEBTOR BEIEVES THEY ARE ACCURATE. NO OTHER PARTY IN INTEREST IS RESPONSIBLE FOR THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. IN PARTICULAR, COUNSEL FOR THE DEBTOR HAS UNDERTAKEN NO INDEPENDENT FACTUAL INVESTIGATION AND HAS RELIED UPON INFORMATION FURNISHED BY THE DEBTOR OR ITS REPRESENTATIVES IN PREPARING THIS DISCLOSURE STATEMENT.

NO REPRESENTATIONS CONCERNING THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCOURSE STATEMENT. ALL OF THE FINANCIAL INFORMATION WITH RESPECT TO THE DEBTOR WAS COMPILED

FROM THE DEBTOR'S RECORDS, AND THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFOROMATION CONTAINED HEREIN IS WITHOUT INACCURACY.

THE PRESENTATION OF THE INFORMATION SET FORTH HEREIN DOES NOT CONSTITUTE FACTUAL OR LEGAL ADMISSIONS BY THE DEBTOR. CERTAIN OF THE INFORMATION, BY ITS NATURE, IS FORWARD LOOKING, CONTAINS ESTIMATES AND ASSUMPTIONS WHICH MAY PROVE TO BE FALSE OR INACCURATE AND CONTAINS PROJECTIONS WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE EXPERIENCES. SUCH ESTIMATES AND ASSUMPTIONS ARE MADE FOR INFORMATIONAL PURPOSES ONLY AND NO REPRESENTATION OR WARRANTY IS MADE WITH RESPECT THERETO.

### 2.8      Additional Information

Certain materials contained in this Disclosure Statement have been taken directly from other sources of information. Documents referred to as filed with the Bankruptcy Court may be inspected at the office of the Bankruptcy Court Clerk in the United States Bankruptcy Court, 900 Market Street, Philadelphia, Pennsylvania or online at the Court's website at http://ecf.paeb.uscourts.gov.

## PART B - THE PLAN AND ITS CONSEQUENCES

## 3.3.   PROVISIONS OF THE PLAN

The following is a simplified description of the Plan, which is enclosed with this Disclosure Statement. REFERENCE SHOULD BE MADE TO THE PLAN ITSELF AND THE EXHIBITS THERETO FOR A FULL ANALYSIS OF ITS CONTENTS. THE DESCRIPTION CONTAINED HEREIN IS QUALIFIED IN ITS ENTIRTY BY SUCH REFERENCE.

### 3.1      Classification and Treatment of Claims and Interests

### Class 1. Secured Claim of 4th Walnut

1.1      **Treatment of Allowed Claim**. The treatment and consideration to be received by 4th Walnut in connection with its Secured Claim shall be in full settlement, satisfaction, release and discharge of all its respective claims and liens in connection with this Claim. The Allowed Claim of 4th Walnut under the 4th Walnut Note and the 4th Walnut Mortgage shall consist of the Allowed portion of the following components: (a) the principal balance of $11,984,927.52 as of June 30, 2010; (b) all monthly installments of principal and interest (at the annual contract rate of 5.0%) in the amount of $70,458.28 that were due and payable from June 1, 2009 through July 1, 2010 as provided in the 4th Walnut Note, less any payments paid on account of these installments ("Pre-Petition Accrued Installments"); (c) all monthly installments of principal and interest (at the annual contract rate of 5.0%) in the amount of $70,458.28 that were due and payable from August 1, 2010 through the Effective Date as provided in the 4th Walnut Note, less the adequate protection payments paid to 4th Walnut ("Post-Petition Accrued Installments"); (d) monthly installments of the tax escrow payment in the amount of $5,407.72~5,916.67 from ~~June 1, 2009~~January 1, 2011 through the Effective Date

("Accrued Tax Escrow Payments"); (e) all monthly installments of principal and interest in the amount of $70,458.28 (at the annual contract rate of 5.0%) that come due after the Effective Date through February 1, 2016   and the monthly tax escrow payment in the amount of $5,407.72 5,916.67 (collectively, the "Unmatured Installments"); (f) on or before March 1, 2016, any remaining principal balance due plus accrued interest (at the annual contract rate of 5.0%) ("Balloon Payment"); and (g) reasonable fees and costs to the extent allowed under 11 U.S.C. §506(b) ("the "506(b) Charges") owed by the Debtor to 4th Walnut as of the Effective Date. The portion of the Allowed Claim of 4th Walnut consisting of allowed 506(b) Charges, if any, shall be paid on the Effective Date as if the 506(b) charges had been requested by 4th Walnut and either (i) agreed to in writing by the Debtor or (ii) approved by a Final Order of the Bankruptcy Court.

   1.2   **Payment of Allowed Claim.**  The portion of the Allowed Claim of 4th Walnut consisting of Pre-Petition Accrued Installments and Post-Petition Accrued Installments shall be paid to 4th Walnut on the Effective Date.  The portion of the Allowed Claim of 4th Walnut consisting of Accrued Tax Escrow Payments shall be paid to 4th Walnut on the Effective Date and shall be utilized by 4th Walnut to pay the property taxes for the Property as they come due.  The Reorganized Debtor shall pay the Unmatured Installments after the Effective Date as they come due and the Balloon payment on or before March 1, 2016.

   1.3   **Retention of Liens**.  4th Walnut shall retain its liens against the Property of the Reorganized Debtor and the secured status of its Claim against the Property of the Reorganized Debtor to same extent as exists on the Effective Date.

   1.4   **Deficiency Claim**.  In the event that 4th Walnut is determined to be an undersecured creditor, the portion of the 4th Walnut Claim which is determined to be secured shall constitute the Class 1 Secured Claim of 4th Walnut under this Plan.  If any remainder of the 4th Walnut Claim is determined to exist (such amount, if it exists, the "4th Walnut Deficiency Claim") shall be included in Class 4 Unsecured Claims under this Plan.  In the event the 4th Walnut Deficiency Claim exists, any funds provided for distribution under the Plan to which the Class 1 Claimant would no longer be entitled (given its status as an undersecured creditor), including any amounts reserved for 4th Walnut's fees, charges and post-petition interest, may be utilized to fund distributions to Allowed Class 4 Claimants.

   1.5   **Extinguishment of Lien**.  Upon payment in full of its Allowed Secured Claim as provided herein, the Lien of 4th Walnut shall be extinguished and shall effect a full and final satisfaction of such claim such that neither the Debtor, nor the Reorganized Debtor, nor the general partner, nor any guarantor, nor other person shall have any liability on account of such Claim.

   1.6   **Alternative Effective Date Cash Option**.  4th Walnut shall have the right to elect payment of the amount of $11,000,000, such payment to be made on the Effective Date; provided, however, that 4th Walnut must (i) affirmatively elect this Alternative Effective Date Cash Option treatment in the ballot cast in connection with the Plan, (ii) vote to accept the Plan, (iii) not file any objection to confirmation of the Plan and (iv) support confirmation of the Plan. A failure of 4th Walnut to make such affirmative election shall result in treatment of the 4th Walnut's Allowed Claim as provided for in Sections 3.1.1 through 3.1.5 of the Plan.  Any payment made under Section 3.1.6 of the Plan to 4th Walnut shall effect a full and final satisfaction of 4th Walnut's Claim such that neither the Debtor, nor the Reorganized Debtor, nor

the general partner, nor any guarantor, nor other person shall have any liability on account of 4th Walnut's Claim.

### Class 2. RAIT Secured Claim:

2.1 **Treatment of Allowed Claim**. The treatment and consideration to be received by RAIT in connection with its Secured Claim shall be in full settlement, satisfaction, release and discharge of all its respective claims and liens in connection with this Claim. The amount of the Allowed Claim of RAIT shall consist of the following components: (i) the principal balance of $600,000 as of the Petition Date, (ii) all monthly installments of interest (at the contract rate) that remain unpaid as of the Effective Date and (iii) reasonable fees and costs to the extent allowed under 11 U.S.C. §506(b) ("the "506(b) Charges") owed by the Debtor to RAIT as of the Effective Date. The Allowed Claim of RAIT shall be paid as follows: (a) all interest payments that remain unpaid as of the Effective Date shall not be due or payable until the earlier of the date that the Class 1 Secured Claim has been paid in full or March 1, 2016; (b) consecutive monthly interest payments (at the contract rate) due after the Effective Date shall commence on the first day of the first month after the Effective Date and continue each month thereafter until the principal balance is paid, and (c) the principal balance due plus accrued interest shall be paid on or before March 1, 2016; provided, however, no principal balance shall be paid until the Class 1 Claim has been paid in full as set forth in this Plan.

2.2 **Retention of Liens**. RAIT shall retain its liens against the Property of the Reorganized Debtor and the secured status of its Claim against the Property of the Reorganized Debtor to same extent as exists on the Effective Date.

2.3 **Deficiency Claim**. In the event that RAIT is determined to be an undersecured creditor, the portion of the RAIT Claim which is determined to be secured shall constitute the Class 2 Secured Claim or RAIT under this Plan. If any remainder of the RAIT Claim is determined to exist (such amount, if it exists, the "RAIT Deficiency Claim") shall be included in Class 4 Unsecured Claims under this Plan. In the event the RAIT Deficiency Claim exists, any funds provided for distribution under the Plan to which the Class 2 Claimant would no longer be entitled (given its status as an undersecured creditor), including any amounts reserved for RAIT's fees, charges and post-petition interest, may be utilized to fund distributions to Allowed Class 4 Claimants.

2.4 **Extinguishment of Lien**. Upon payment in full of its Allowed Secured Claim as provided herein, the Lien of RAIT shall be extinguished and shall effect a full and final satisfaction of such claim such that neither the Debtor, nor the Reorganized Debtor, nor the general partner, nor any guarantor, nor other person shall have any liability on account of such Claim.

### Class 3. Priority Non-Tax Claims.

The treatment and consideration to be received by holders of Allowed Class 3 Claims shall be in full settlement, satisfaction, release and discharge of their respective Claim. Class 3 Allowed Claims will be paid on the Effective Date.

### Class 4. General Unsecured Creditors:

4.1    **Treatment of Allowed Claim**.    The treatment and consideration to be received by holders of Allowed Class 4 Claims shall be in full settlement, satisfaction, release and discharge of their respective Claim. Unless they elect the alternative cash option treatment provided in Section 3.4(b) hereof, holders of Allowed Class 4 Claims shall be paid 100% as follows:

4.1.1    within thirty (30) days after the later date of the (i) Effective Date or (ii) the date on which the Claim becomes an Allowed Claim, 25% of their Allowed Claim;

4.1.2    within one year after the later date of the (i) Effective Date or (ii) the date on which the Claim becomes an Allowed Claim, 25% of their Allowed Claim;

4.1.3     within two years after the later date of the (i) Effective Date or (ii) the date on which the Claim becomes an Allowed Claim, 25% of their Allowed Claim; and

4.1.4    within three years after the later date of the (i) Effective Date or (ii) the date on which the Claim becomes an Allowed Claim, 25% of their Allowed Claim.

4.2    **Alternative Effective Date Cash Option**.    Any Class 4 Claimant shall have the right to elect payment of an amount equal to seventy (70%) percent of the Allowed Claim, such payment to be made on the Effective Date; provided, however, that the Class 4 Claimant must (i) affirmatively elect such treatment in the ballot relating to voting to approve or reject the Plan, (ii) vote to accept the Plan, and (iii) not file any objection to confirmation of the Plan.    A failure of any Class 4 Claimant to make such affirmative election shall result in treatment of the Class 4 Claimant's Allowed Claim as provided for in Section 3.4.1 hereof. Any payment made under this Section of the Plan shall effect a full and final satisfaction of such claim such that neither the Debtor, nor the Reorganized Debtor, nor the general partner, nor any guarantor, nor any other person shall have any liability on account of such Claim.

### Class 5. Affiliate Unsecured Creditors:

5.1    Class 5 consists of allowed claims of unsecured creditors of the Debtor who are "affiliates" of the Debtor, as that term is defined in §101(2) of the Bankruptcy Code. These claimants consist primarily of individuals who, or entities, which have a relationship of ownership to the Debtor.    According to the Debtor's schedules, the Debtor had outstanding obligations to the following affiliated entities: 1930 Chestnut Street Associates, L.P. ($79,962.00); Turchi ($49,556.00); Mortgage Acquisition, LLC ($530.00); and Turchi Inc. ($4,146,018.00).    Under the Plan, the outstanding pre-petition balances due Turchi, Inc. and other insiders may be paid only after Class 1 (4th Walnut), Class 2 (RAIT), Class 3 (Priority Claims) and Class 4 (Unsecured Claims) are paid in full.

5.2    **Treatment of the Allowed Claim**.    The treatment and consideration to be received by holders of Allowed Class 5 Claims shall be in full settlement, satisfaction, release and discharge of their respective Claim. Holders of Allowed Class 5 Claims will receive, on the Effective Date, a cash flow note which will accrue interest but provide for no payments from the Debtor until the earlier of repayment in full of all amounts due to all of the Debtor's creditors

holding claims on the Effective Date or the fourth anniversary of the Effective Date; provided, however, payments may only be made to Holders of Allowed Class 5 Claims if the Reorganized Debtor has made the required payments under this Plan to holders of Class 1, Class 2, Class 3 and Class 4 Claims.  Notwithstanding the foregoing, unless this amount or treatment is changed by a subsequent order of Court, then each holder of an (Affiliate) Claim will receive, on the Effective Date, a cash flow note in the amount of their Allowed Claim, without interest, that shall provide for no payments from the Debtor until all Class 1, Class 2, Class 3 and Class 4 Claims are paid as set forth in this Plan.  The final treatment of the (Affiliate)'s Claims have not been determined.

> **Class 6.  Limited Partner Interests:**  The interests of each limited partner shall remain equal to the interest of the respective limited partner as of the Petition Date.

> **Class 7.  General Partner Interest:**  The interests of the general partner shall remain equal to the Interest of the general partner as of the Petition Date.

## 3.2    Unclassified Administrative Claims

The allowed claims of those creditors whose claims constitute administrative expenses under the Bankruptcy Code will be paid in full in cash on the Effective Date (to the extent not paid previously during the administration of the case) or in accordance with such terms as may be agreed upon by each holder of such claim and the Debtor.  It is estimated that the administrative expenses in this case will exceed $~~200~~355,000, net of the pre-petition retainer in the amount of $54,888.28.  ~~Currently, the Debtor's counsel has incurred cumulative fees and expenses in the approximate amount of $175,000~~By Order dated March 1, 2011, Debtor's counsel was awarded fees and costs in the amount of $273,203.94 through December 31, 2011. ~~net of the pre-petition retainer.~~  In addition, the Debtor's appraiser, Ludwig Corporation, has fees in the approximate amount of $8,500 for the preparation of its report plus $325 per hour for any testimony provided.

## 3.3    Other Provisions of the Plan

### 3.3.1   Preservation of Rights

In the Plan, the Debtor specifically preserves any preference claims, fraudulent conveyance claims or other claims, which it may have against any creditor or other party under the Bankruptcy Code or other applicable law.  Confirmation and effectiveness of the Plan will not be deemed to release any such claims.  However, given the proposed substantial payments to creditor constituencies under the Plan, the Debtor does not believe that an investigation into pre-petition transfers is warranted.  Except for claims that the Debtor is asserting against 4th Walnut and certain of its affiliates by a Complaint and Objection to Claim filed with this Court commencing Adversary Action No. ~~——,~~ 10-0456, the Debtor is not aware of any other claims that it may have against other creditors; however, the Debtor reserves all rights to review the Claims filed against the Debtor and to object to any such Claims. On January 10, 2011, 4th Walnut filed a Motion to Dismiss seven of the eight counts in the Complaint which the Debtor opposed.  By an Opinion and Order dated March 31, 2011, the Bankruptcy Court dismissed Counts I through VI of the Complaint for failure to state a claim upon which relief may be granted and denied the Motion to Dismiss as to Count VII, with the exception of the demand for attorney's fees which was dismissed.  Accordingly, the only two counts that remain pending

against 4th Walnut are Count VII – Intentional Interference with Prospective Contractual Relations (Plaintiff against all Defendants) and Count VIII – Objection to the 4th Walnut Claim.

### 3.3.2    **Effective Date**

The Effective Date is the date on which the confirmed Plan takes effect. If the Effective Date does not occur, the Plan, although confirmed, cannot be consummated and will give rise to no rights or liabilities. The Effective Date is estimated to occur on or about March August 1, 2011.

### 3.3.3    **Releases**

The Plan provides for certain releases, exculpation of liability and injunctions.

If 4th Walnut elects the Alternative Effective Date Cash Option under Section 3.1.6 of the Plan it will, upon receipt of the payment of $11,000,000, have released any claim that it may have against the Debtor, the Reorganized Debtor, the general partner, any guarantor and any other person of liability on its claim.

Any Class 4 creditor accepting the Alternative Effective Date Cash Option under Section 3.4.2 of the Plan will be deemed to, by virtue of the payment of the cash portion of its claim, have released any claim that it may have against the Debtor, the Reorganized Debtor, the general partner and any other person of liability on such claim.

Also, upon payment of the Class 1 and Class 2 Allowed Secured Claims as set forth in the Plan, Class 1 and Class 2 Creditors will be deemed, by virtue of the payment of their Claim in full as set forth in the Plan, to have released any claim that they may have against the Debtor, the Reorganized Debtor, the general partner, any guarantors and any other person of liability on such claims.

In addition, the Confirmation Order in accordance with 11 U.S.C. §1141 will also serve to enjoin all claimants from taking any actions against the Debtor, the Reorganized Debtor, its property or its limited or general partners or the Property on account of any discharged claims, debts or liabilities. Sunlight Electrical Contracting Co., Inc. ("Sunlight") contends that the Confirmation Order may not enjoin Sunlight from pursuing the general partner or Turchi in another forum on account of its discharged claim. Sunlight also asserts that this is true even if such claim, as may be allowed by the Bankruptcy Court, is paid in full by the Debtor under the provisions of the Plan.

In addition, 4th Walnut will be prohibited from pursuing its claim against the Debtor, the Property, the Reorganized Debtor, the general partner or any guarantors, so long as the Reorganized Debtor remains current on the 4th Walnut obligations and satisfies the 4th Walnut obligations on or before March 1, 2016.

### 3.3.4    **Disputed Claims**

In connection with the Plan and bankruptcy process, the Debtor will have the opportunity to review the claims of creditors and determine if it objects to the amount or

characterization of the claims. The Debtor has not completed its analysis of the various claims, but will do so in the 120-day period subsequent to the confirmation of the Plan.

If an objection is filed to a claim, it becomes and is treated as a Disputed Claim under the Plan. Claims which remain Disputed Claims as of the Effective Date will not receive their proposed distribution until the claim is definitely resolved by agreement and/or final non-appealable Court Order.

3.3.5  **Proofs of Claim filed by 4th Walnut Associates**. On October 15, 2010, 4th Walnut filed a proof of claim asserting a secured claim in the amount of $15,267,261 plus attorneys' fees and costs which was docketed as Claim No. 7-1. This claim contained no supporting documentation. On October 20, 2010, 4th Walnut filed an amended claim asserting a secured claim in the amount of $30,534.522 plus attorneys' fees and costs which was docketed as Claim No. 7-2. Also on October 20, 2010, 4th Walnut filed a second amended claim asserting a secured claim in the amount of $15,267,261 plus attorneys' fees and costs which was docketed as Claim No. 7-3. Attached to the 4th Walnut Claim No. 7-3 is an itemized statement of debt that provides the following itemization:

| | |
|---|---|
| Principal (see attached documents) | $13,200,754.35 |
| Interest (as of 7/20/2010) | $ 1,344,050.75 |
| Late Charges | $   714,394.71 |
| Prepayment Premium | $      8,061.20 |
| TOTAL | $15,267,261.00 |

The Debtor has filed a complaint with the Bankruptcy Court against 4th Walnut and certain of its affiliates asserting breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, intentional interference with existing and/or prospective contractual relations and objection to 4th Walnut's Claim No. 7-3, this matter is pending under Adversary No. ~~10~~ 10-0456 ~~————.~~

### 3.3.6  Executory Contracts and Unexpired Leases

The Plan provides that, unless provision is otherwise made in either the Plan or a separate motion is filed prior to the Effective Date, all executory contracts and unexpired leases to which the Debtor is a party will be rejected. The Plan further provides that claims for rejection damages must be filed no later than 30 days after the Effective Date. Such claims will be treated as general unsecured claims under Class 4. All leases with tenants at the Property in existence as of the Effective Date are hereby assumed. The Lease Agreement was rejected by an Order of the Bankruptcy Court dated August 24, 2010 [Docket No. 57].

## 4.   FEASIBILITY OF THE PLAN

Section 1129 of the Bankruptcy Code provides that the Bankruptcy Court shall not confirm a plan of reorganization unless the plan is feasible; that is, that its confirmation is not likely to be followed by liquidation or the need for further financial reorganization. Based upon the financial data and projections set forth below and the assumptions contained therein, the Debtor has concluded that the Plan satisfies this criterion.

### 4.1    Financial Statements and Projections

Attached hereto as Exhibit "D" are the Debtor's financial statements showing results from January 1, 2010 through July 31, 2010, as compiled by the Debtor. Also attached hereto as Exhibit "C" are projections prepared by the Debtor relating to the Reorganized Debtor's operations and financial activities for August 1, 2010 through January 31, 2011, as well as a five-year forecast for years 2011 through 2016.

Attached as Exhibit "B" is the projected sources and uses of cash on the Effective Date. This projection presents a picture of the Debtor's projected financial position on or about ~~March~~ August 1, 2011 and describes the transactions which, under the Plan, would occur on that date. This statement indicates that on the Effective Date, the Reorganized Debtor will have sufficient funds to make all necessary payments under the Plan and to continue operations as set forth in the projections. The projections begin with the transactions on the Effective Date and show the amounts projected to be received as cash from operations and the proceeds from the refinance of the Property. The projections further show (i) payments to be paid on the Effective Date, (ii) scheduled installment payments under the Plan to pay 4th Walnut, (iii) payments to Classes 2, 3, and 4 claimants, and (iv) payments to be paid on the Effective Date to the unclassified claims. The projections include an explanation and description of the assumptions underlying the projections.

The Debtor believes that the net operating income figures included in the projections are reasonable. This opinion is based on the Debtor's knowledge of the Property and market conditions and the ability to control expenses on the Property.

**THE PROJECTIONS INVOLVE ESTIMATES OF FUTURE FINANCIAL PERFORMANCE AND SHOULD NOT BE CONFUSED WITH THE ACTUAL FINANCIAL POSITION OF THE REORGANIZED DEBTOR AT OR FOR THE HPERIODS INDICATED, WHICH MAY DIFFER MATERIALLY FROM THE PROJECTIONS.**

The Debtor believes the projected financial data to be reasonable and has incorporated conservative assumptions into the projections, but no assurance can be given that the results shown will be realized or even approximated. Certain assumptions used in preparing the projections are set forth in the notes following the projected financial data, which notes are an integral part of the projections and of this Disclosure Statement. Because of the inherent uncertainty of any projections of future performance, the projections must be treated with a considerable degree of caution. The projections should be read in conjunction with the notes thereto, the other information set forth in this Disclosure Statement and with the Debtor's financial statements attached hereto.

### 4.2    Protections Built Into the Plan

The Plan includes numerous features which are designed to enhance its feasibility and to provide protection against future liquidation or the need for further financial reorganization. The Debtor believes that the prospects for the success of the Property under the ownership of the Reorganized Debtor after confirmation of the Plan will be favorable. The reason for this optimism is that the Debtor has filed a request with The Bancorp for a credit facility that will provide the funds necessary to satisfy the 4th Walnut obligations as set forth under the Plan. The

new financing will have more favorable terms and therefore, the Debtor believes its forecasts are achievable. The Debtor expects to have a commitment for the financing from The Bancorp on or before the Confirmation Hearing.

## 5.    ALTERNATIVES TO THE PLAN

### 5.1    Relief From Stay

One alternative to the Plan is for the Bankruptcy Court to grant 4th Walnut relief from the automatic stay. Relief from the automatic stay would be appropriate under the Bankruptcy Code and applicable Supreme Court rulings if the Debtor had no equity in the Property and personal property and such real estate or personal property was not necessary to an effective reorganization, which would be effectuated within a reasonable time. Relief from stay would be quickly followed by foreclosure proceedings of the mortgage on the Property asserted by 4th Walnut.

On August 6, 2010, 4th Walnut filed a motion for relief from the automatic stay (the "Stay Motion"). Pursuant to the Stay Relief Motion, 4th Walnut has sought stay relief (i) pursuant to 11 U.S.C. §362(d)(2) because 4th Walnut contends the Debtor has no equity in its property and because the property is not necessary for an effective reorganization reasonably in prospect and (ii) pursuant to 11 U.S.C. §362(d)(1) for cause, including lack of adequate protection of its interest in the collateral. The hearing on the Stay Relief Motion is in process. The Debtor will defend it vigorously.

### 5.2    Objection to Use of Cash Collateral

On September 30, 2010, 4th Walnut filed (a) Objection to the Debtor's continued use of cash collateral and (b) Cross Motion to prohibit use of rents, to compel debtor to segregate rents and for an accounting (the "Objection to Use of Cash Collateral"). The hearing on the Objection to Use of Cash Collateral is in process was held on December 9, 2010. The Debtor will defend it vigorously. At the hearing the parties agreed that a ruling on who owns the rents which derive from the Property was in order and the parties filed memoranda of law supporting their respective positions. By an Opinion and Order dated February 21, 2011, the Bankruptcy Court held that the rents derived from the Property constituted cash collateral. On March 9, 2011, 4th Walnut filed a Motion to Reconsider (the "Reconsideration Motoin") the Bankruptcy Court's Order dated February 21, 2011 and in response, the Debtor filed a Motion to Strike the Reconsideration Motion. A hearing on the Motion Strike is scheduled for April 21, 2011.

It is possible that the total valid secured claims of 4th Walnut would exceed the value of the Property at a foreclosure sale. Under distress sale conditions following foreclosure, it is probable that the only claim which would be paid anything would be the claim of 4th Walnut. Holders of Class 4 claims (i.e. general unsecured creditors) would likely receive nothing.

### 5.3    Liquidation

Another alternative to the Plan is liquidation of the Debtor's estate after conversion of the case to Chapter 7. Liquidation would have essentially the same result as relief from stay. (See the discussion in Section 5.1), except that sale of the Property could possibly be conducted in a more orderly fashion. While this might result in somewhat higher net proceeds for distribution,

the Debtor believes that the value of the Property in a Chapter 7 liquidation is less than the value of 4th Walnut's claim.

The Debtor has considered whether the creditors and interest holders would receive more upon liquidation of the Debtor's estate than under the Plan. A detailed Liquidation Analysis is attached as Exhibit "A." The Debtor has concluded that a liquidation of the estate would yield less funds for payment of the claims of Classes 2, 3, 4, 5, 6, and 7 claimants than such claimants would realize under the Plan.

### 5.4    Different Plan

Another alternative to the Plan would be the proposal of a different plan by another party in interest in the event that the Plan is not confirmed or does not become effective.

## 6.    CONFIRMATION OF THE PLAN

### 6.1    Voting on the Plan

The Plan cannot be consummated unless it is confirmed by the Bankruptcy Court. Confirmation of the Plan requires, among other things, either (i) that each Class of claims or interests that is impaired by the Plan has voted to accept the Plan by the requisite majorities, or (ii) that the Plan is determined by the Bankruptcy Court not to discriminate unfairly and to be fair and equitable, as defined by the Bankruptcy Code, with respect to classes of claims and interests that have rejected the Plan.

### 6.2    Voting Eligibility

The Class 3 claims are not impaired under the Plan and the holders of the Class 6 and Class 7 interests are not impaired under the Plan. Holders of claims in Class 3 will be paid in full in cash on the Effective Date of the Plan and the Class 6 and Class 7 interests are not terminated. The holders of the Class 3 claims and the holders of the Class 6 and Class 7 interests are, therefore, not eligible to vote on the Plan.

All holders of Classes 1, 2, 4 and 5 claims are eligible to vote on the Plan.

### 6.3    Acceptance and Rejection

With respect to Classes 1, 2, 4 and 5 such Classes will be deemed to have accepted the Plan if the holders of at least two-thirds in aggregate dollar amount and more than one-half in number of the Allowed Claims that are actually voted for or against the Plan vote to accept the Plan.

### 6.4    Confirmation Despite Dissent

Even though a class has not accepted the Plan, and other classes may vote against the Plan, the Plan may nevertheless be confirmed by the Bankruptcy Court if (i) the Plan is accepted by at least one impaired class and meets all of the other requirements of §1129(a) of the Bankruptcy Code; (ii) the Court finds that the Plan does not discriminate unfairly; and (iii) the Court finds that the Plan is fair and equitable to the rejecting Classes. Such a finding would

require a determination by the Bankruptcy Court that the Plan meets the requirements of §1129(b) of the Bankruptcy Code, including that no holder of any claim or interest junior to the claims of the rejecting Class is receiving or retaining any property or payment under the Plan solely on account of such claim or interest. The Debtor believes that the Plan satisfies this criterion.

### 6.5    Other Conditions to Confirmation

Section 1129 of the Bankruptcy Code contains other criteria which the Bankruptcy Court must find have been met before it may confirm a plan of reorganization. One criterion, which is applicable unless every holder of an impaired claim against or interest in the Debtor has voted to accept the Plan, is that the amount to be received under the Plan by each rejecting holder of a claim or interest impaired under the Plan is not less than the amount such holder would have received had the Debtor's estate been liquidated.

To calculate what members of each impaired class of claims and interest would receive if the Debtor were liquidated, the Bankruptcy Court would first determine the dollar amount that would be generated from the liquidation. After determining this amount, the Bankruptcy Court would then subtract the cost of the liquidation (including commissions, transfer taxes and other costs of sale, trustee's fees, if a trustee is appointed, and the fees of professionals employed by the trustee), the unpaid expenses of the reorganization proceeding and other bankruptcy priority obligations. The Bankruptcy Court would further subtract from the liquidation value of the Debtor's estate the amount of any secured claims, to the extent of the value of the property securing such claims. These and any other claims arising from the liquidation or from current reorganization proceedings would be paid in full before any funds would be made available to pay unsecured creditors. The court would then determine the amount of unsecured claims allowed in the liquidation proceedings. If the proceeds from liquidation (after subtracting the amounts described above) were not sufficient to pay in full the total amount of allowed unsecured claims, there would be no need to determine the amount owing to classes of claims and interests junior to unsecured claims (e.g., general partnership interests and limited partnership interests) because such junior claims and interests would not be entitled to receive any distribution in the liquidation. The value of the distribution resulting from a liquidation, if any, would be compared with the value offered to the classes of unsecured claims and interests under the Plan. See Exhibit "A" for the Debtor's analysis of the liquidation scenario. The Debtor believes that the Plan provides creditors with a greater recovery than in liquidation.

As described in Section 5, the Debtor believes that Classes 1, 2, 3, 4, 5, 6, and 7 will receive or retain, under the Plan, on account of such claim or interest, a value that is equal to or greater than the amount that such claimant would receive or retain if the Debtor were liquidated.

### 6.6    Operation Pending Confirmation and Effectiveness

Pending confirmation and effectiveness of the Plan, the Debtor will continue to be operated as a debtor-in-possession by the General Partner and the Property will continue to be managed by Turchi, Inc.

Until the Plan is confirmed and becomes effective, none of the Plan provisions shall be effective and none of the restrictions contained therein will be applicable. In addition, until the

Effective Date, the automatic stay imposed by operation of the Bankruptcy Code will remain in effect.

### 6.7    Disputed Claims

The actual amount of the payments to certain creditors may depend on the resolution of disputed claims. The Debtor is continuing to analyze proofs of claim filed by creditors in the case and to compare them to amounts shown on the Debtor's books for liabilities to such creditors. Such differences have been and will continue to be reduced or eliminated by reconciliation of accounts or by agreements with the respective creditors. No payments will be made to disputed creditors until such time as the dispute has been resolved. The Debtor has filed a complaint against 4th Walnut and certain of its affiliates asserting breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, and intentional interference with existing and/or prospective contractual relations and objection to 4th Walnut's Claim No. 7-3, this matter is pending under Adversary No. 10-04561~0~ _____.

### 6.8    Anticipated Administrative Claims

Administrative claims are those claims associated with the administration of the bankruptcy case, including the fees approved by the Court of the Debtor's attorneys, accountants and other experts. It is estimated that total administrative claims in the case will be in excess of ~~several hundred thousand dollars~~$350,000 for professional fees and charges. (See Section 3.2 for a further explanation of the professional fees and charges).

## 7.    CONSEQUENCES OF THE PLAN

### 7.1    Recovery of Avoidance Actions

Sections 544 and 548 of the Bankruptcy Code allow the recovery of certain payments made for less than fair consideration at a time when the Debtor was insolvent. The Plan expressly reserves the right of the Debtor to pursue any potential preference recoveries. However, given the proposed substantial payments to creditor constituencies under the Plan, the Debtor does not believe that an investigation into pre-petition transfers is warranted.

### 7.2    Jurisdiction of the Bankruptcy Court

Under the Plan, the Bankruptcy Court retains jurisdiction after the Effective Date to (1) classify, re-examine and determine objections to claims; (2) determine all questions, disputes, causes of action or controversies regarding or involving either the Debtor or assets of the Debtor's estate and arising either prior to the Effective Date, whether or not subject to action pending at confirmation, or subsequent to the Effective Date; (3) determine matters as contemplated under §1142 of the Bankruptcy Code or with respect to the discharge of the Debtor under the Plan; (4) correct, modify or interpret the Plan; (5) enter orders to facilitate consummation of the Plan, to enable the Effective Date to occur, to enforce or to limit the title, rights and powers of the Debtor or claimants, or to close the bankruptcy case or any other order; and (6) reconsider or vacate the order of confirmation if consummation of the Plan on the Effective Date is rendered impossible.

**400 WALNUT ASSOCIATES, L.P.,**
**a Pennsylvania Limited Partnership**

By: _____ */s/ John J. Turchi, Jr.* _____
    JOHN J. TURCHI, Jr., President

**MASCHMEYER KARALIS P.C.**

By: _____ */s/ Aris J. Karalis* _____
    ARIS J. KARALIS
    1900 Spruce Street
    Philadelphia, PA  19103
    215-546-4500
    Attorneys for the Debtor

## LIST OF EXHIBITS

Exhibit "A"          Liquidation Analysis

Exhibit "B"          Sources and Uses of Funds as of the Effective Date

Exhibit "C"          Financial Projections of the Debtor

Exhibit "D"          Financial Statements of the Debtor